Willie D. HILLIARD, Jr., Plaintiff,

v.

**BELLSOUTH MEDICAL ASSISTANCE PLAN and Blue Cross Blue Shield of Alabama, Defendants.**

Civil Action No. 3:95–cv–793WS.

United States District Court,
S.D. Mississippi,
Jackson Division.

Nov. 28, 1995.

Clifford K. Bailey, III, Charles E. Ross, Wise, Carter, Child & Caraway, Jackson, MS, for plaintiff.

Stephen L. Earnest, BellSouth Telecommunications, Jackson, MS, Keith W. Kochler,

BellSouth Telecommunications, Atlanta, GA, for defendants.

## ORDER DENYING PRELIMINARY INJUNCTION

WINGATE, District Judge.

Before the court is the complaint of the plaintiff Willie Hilliard brought pursuant to the Employee Retirement Income Security Act, Title 29 U.S.C. § 1001, *et seq.*, (hereinafter "ERISA"), and the Americans with Disabilities Act, Title 42 U.S.C. § 12101, *et seq.*, (hereinafter "ADA"), seeking a preliminary injunction under Rule 65, Federal Rules of Civil Procedure, to require the BellSouth Medical Assistance Plan (hereinafter "MAP") and the administrator of MAP, Blue Cross Blue Shield of Alabama to provide to the plaintiff insurance coverage for high dose chemotherapy with peripheral stem cell rescue (also referred to as "HDC/PSCR"). The plaintiff, who suffers from a blood cancer known as multiple myeloma, claims that without this treatment his life expectancy will be no more than six months to one year and that he is unable to afford the high cost of this treatment without insurance coverage. All parties agree that plaintiff needs this treatment as soon as possible to assure that it will be effective. It is the plaintiff's hope that this treatment will place his disease in remission and significantly extend his life expectancy by as much as four to five years. BellSouth and Blue Cross Blue Shield of Alabama (hereinafter "BellSouth" and "Blue Cross" or the "defendants") have denied the requested coverage, contending that MAP excludes the treatment in question for multiple myeloma.

After this lawsuit was filed on October 26, 1995, this court conducted a conference on November 2, 1995, concerning the status of the case. At this conference, the parties were directed to present arguments pertaining to the plaintiff's request for injunctive relief. However, the parties required additional time to call their respective witnesses. Furthermore, the parties needed time to discuss the possibility of settlement. Thus, this court scheduled the parties' arguments on the matter of injunctive relief for November 17, 1995. In view of this schedule, this court directed plaintiff to request an expedited, formal administrative appeal of BellSouth's previous decision to deny coverage.[1] The determination of the Assistant Medical Director of Blue Cross issued on November 10, 1995, upheld the decision of BellSouth not to cover the requested treatment.

This court's jurisdiction is predicated on Title 29 U.S.C. § 1132(e)(1) which provides that, "... the district courts of the United States shall have exclusive jurisdiction of civil actions under this subchapter brought by the Secretary or a participant. State courts of competent jurisdiction and district courts of the United States shall have concurrent jurisdiction of actions under subsection (a)(1)(B) of this section." Additionally, this court's jurisdiction is based on Title 28 U.S.C. § 1331 [2] (federal question).

## THE PLAINTIFF'S ILLNESS AND THE TREATMENT SOUGHT

The plaintiff, Willie Hilliard, a 39 year old regular full-time employee of BellSouth until his medical retirement in March of 1995, was diagnosed in March of 1992 to be suffering with multiple myeloma, also known as plasma cell myeloma or myelomatosis. This disease is characterized by marrow plasma cell tumors and overproduction of certain proteins associated with cancerous bone lesions.[3] The plaintiff was treated with conventional chemotherapy, but the disease remained active. Believing that the plaintiff might benefit from a more aggressive treatment, the plaintiff's treating physician, Dr. G. Crawley Stub-

---

1. Although the text of ERISA does not expressly mention the exhaustion doctrine, it is well-established that federal courts have the authority to require exhaustion of remedies in suits arising under ERISA. *See Simmons v. Willcox*, 911 F.2d 1077, 1081 (5th Cir.1990); *Meza v. General Battery Corp.*, 908 F.2d 1262, 1279 (5th Cir.1990); *Denton v. First National Bank of Waco, Texas*, 765 F.2d 1295, 1301 (5th Cir.1985).

2. Title 28 U.S.C. § 1331 provides that, "the district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

3. See *The Merck Manual of Diagnosis and Therapy*, Sixteenth Edition, pp. 1254–56 (1992).

blefield, recommended high dose chemotherapy supported by a bone marrow transplant.

Transplanted bone marrow comes from any of three sources: from a suitable donor such as a twin or sibling (referred to as an "allogenic" bone marrow transplant); an autologous bone marrow transplant involving extraction of the patient's own bone marrow for reinfusion after high dose chemotherapy (often abbreviated HDC/AuBMT); or a peripheral stem cell rescue involving extraction of stem cells from the patient's blood stream (HDC/PSCR). According to the plaintiff, HDC/PSCR is estimated to cost between $80,000.00 and $100,000.00; an autologous bone marrow transplant is estimated to cost $120,000.00; and the allogenic bone marrow transplant from a suitable donor may cost as much as $250,000.00. The plaintiff and his wife have a combined income of about $1300.00 per month and are unable to afford the treatment in question.

The treatment sought by the plaintiff, HDC/PSCR, consists of the administration of low doses of chemotherapy in the first phase and moderate doses of chemotherapy in the second phase. The increased dosage causes the patient's body to produce extra components in the blood stream known as "stem cells" (the primary building blocks of red blood cells, white blood cells and platelets found in circulating blood). Then, in the next phase, the patient's blood is harvested for these stem cells by a procedure called leukapheresis, a process similar to dialysis. The harvested stem cells then are frozen and stored in liquid nitrogen. The patient subsequently is subjected to high doses of chemotherapy which destroy healthy blood cells and bone marrow, as well as cancer cells. Finally, the patient's harvested stem cells are thawed and reinfused into the patient's system so that the body will begin to regenerate healthy blood cells and marrow and restore the patient's immune system. *See Wilson v. Office of CHAMPUS,* 866 F.Supp. 903, 905 (E.D.Va.1994), *aff'd,* 65 F.3d 361 (4th Cir. 1995) (generally describing HCD/PSCR treatment).

## THE MEDICAL ASSISTANCE PLAN (MAP)

The plaintiff is covered for medical treatment under MAP which is funded by the defendant BellSouth through four trusts. The administrator of MAP is the defendant Blue Cross. Employees and their dependents participate in the MAP at no premium cost. Coverage under MAP is set forth and explained in two documents, the claims administration manual (to which employees usually do not have access) and a summary plan description. According to the summary plan description, the MAP provides coverage for cornea, heart, kidney and bone marrow transplants from human donors. For bone marrow transplant coverage under MAP, the patient must have a life-threatening illness and the transplant must have a reasonable probability of success.

On January 1, 1990, MAP's summary plan description was amended to cover autologous bone marrow transplants for three specific conditions: advanced Hodgkin's disease in individuals for whom conventional treatment had failed; acute leukemia in remission in individuals who have high probability of relapse; and for specific resistant non-Hodgkin's lymphomas. This amendment did not include multiple myeloma as one of the medical conditions covered by MAP. Furthermore, on October 25, 1993, MAP was amended to clarify that the limitation of autologous bone marrow transplants to these three specific medical conditions also applied to stem cell transplants like the treatment being sought by the plaintiff. This change was incorporated into Map's claims administration manual effective January 1, 1994. The change is not reflected in the summary plan description.

According to BellSouth, MAP's trust funds suffer under a tremendous financial burden which would be exacerbated greatly if MAP is required to provide the medical treatment sought by the plaintiff. This is why, says BellSouth, that in 1990 a Supplemental Transplant Assistance Plan (hereinafter "STAP") was implemented in order to provide employees coverage for autologous transplants and other medical procedures not covered by the MAP. At first STAP covered only a limited number of cancers. Then, STAP was amended on January 1, 1993, to

cover autologous bone marrow transplants for multiple myeloma. Subsequently, on June 20, 1994, STAP was amended to provide coverage for stem cell rescue in treatment of multiple myeloma.

The right to participate in STAP, says BellSouth, was offered to all regular full-time employees, including the plaintiff, between December 1, 1990, and January 31, 1991. Unlike the MAP, the STAP required payment a relatively small monthly premium ($4.00 for individual coverage and $8.00 for family coverage as of January 1, 1993). All eligible employees, including the plaintiff, were given STAP enrollment forms and warned that they must enroll between December 1, 1990, and January 31, 1991; otherwise, there would be no opportunity to enroll in the future. The plaintiff declined the opportunity to participate in the STAP. Thus, the plaintiff was unable to claim benefit of the January 1993 and June 1994 amendments to STAP.

The plaintiff was diagnosed with multiple myeloma in March of 1992 and underwent conventional chemotherapy which was covered by MAP. In April of 1994, says BellSouth, the plaintiff's health care providers began to inquire whether MAP would provide coverage for high dose chemotherapy supported by an allogenic bone marrow transplant. MAP approved coverage for this treatment because it involved a transplant from a human donor. However, the plaintiff was unable to locate a suitable human donor and could not benefit from this treatment. Thereafter, in February of 1995, the plaintiff attempted to obtain coverage under MAP for an autologous bone marrow transplant. MAP rejected the plaintiff's request for coverage, contending that MAP would not pay for an autologous bone marrow transplant if it was being performed to treat multiple myeloma.

Then, in October of 1995, Dr. E.R. Broun, Associate Professor of Medicine at St. Louis University Medical Center, wrote to inform the MAP that the plaintiff was a candidate for a high dose chemotherapy protocol supported by a stem cell rescue instead of an autologous bone marrow transplant. The plaintiff signed a consent form in order to receive this treatment. However, based on the information provided in the protocol and the consent form signed by the plaintiff, MAP denied coverage for this treatment.

### THE ADMINISTRATIVE APPEAL

After MAP denied coverage for the protocol recommended for the plaintiff by Dr. Broun, the plaintiff filed this lawsuit on October 26, 1995, seeking a preliminary injunction to require of BellSouth and Blue Cross the coverage for the treatment the plaintiff is seeking. On November 2, 1995, this court conducted a conference for the purpose of hearing arguments on the plaintiff's request for injunctive relief. When the parties requested additional time to prepare for argument and obtain witnesses, this court determined that the plaintiff should pursue in the interim an administrative appeal of the MAP's denial of coverage. The plaintiff submitted his administrative appeal the next day.

On November 10, 1995, Dr. Stanley Forston, Jr., the Assistant Medical Director of Blue Cross, affirmed BellSouth's denial of coverage for HDC/PSCR based on MAP's policy limitations and on MAP's exclusion of experimental or investigative medical procedures. According to Dr. Forston's findings, coverage under MAP for bone marrow transplants which come from the patient is limited to specified conditions which do not include multiple myeloma. Dr. Forston noted that only STAP covers multiple myeloma and that the plaintiff had rejected coverage under STAP.

Dr. Forston also rejected the plaintiff's contention that MAP's limitation of coverage for autologous bone marrow transplants did not apply in the instant case because peripheral stem cell rescue is a separate procedure. Dr. Forston noted Blue Cross' position that the terms "autologous bone marrow transplant" and "peripheral stem cell rescue" are interchangeable medical terms since they are both methods for obtaining stem cells for reinfusion into a patient's body after high dose chemotherapy. According to Dr. Forston, marrow cells, or stem cells, whether collected from the patient's bone marrow or blood stream, perform the same function and

provide the same result—the creation of normally functioning bone marrow after high dose chemotherapy.

Furthermore, referring to one of the articles submitted with the plaintiff's administrative appeal, Dr. Forston notes that the medical researchers who produced the article regarded stem cell rescue, autologous bone marrow harvesting, and the allogenic (donor) procedure all to be forms of bone marrow transplants. Additionally, Dr. Forston notes the references of Dr. Broun's protocol to bone marrow harvesting, bone marrow aspiration, and bone marrow transplantation. Referring to the consent form signed by the plaintiff, Dr. Forston points to the language stating that, "autologous transplantation means receiving back my own previously collected peripheral blood stem cells *or bone marrow."* The consent form, says Dr. Forston, indicates that the physician will collect peripheral blood stem cells as well as bone marrow and that stem cells may be found in peripheral blood or in bone marrow. So, Dr. Forston concludes, while the method of collection may differ, the primary therapy recommended by Dr. Broun is high dose chemotherapy with reinfusion of either blood marrow or peripheral blood stem cells that go to the bone marrow.

Finally, Dr. Forston notes that MAP provides an exclusion for treatments that are "experimental or investigative." According to MAP's claims administration manual, a treatment is experimental or investigative unless it is an approved means of treatment and as effective as any alternative treatment as determined by Medicare and Blue Cross Blue Shield Association and Blue Cross Blue Shield of Alabama. The Blue Cross Blue Shield Medical Advisory Plan, notes Dr. Forston, has determined that high dose chemotherapy regimens for multiple myeloma *do* not meet the criteria for an approved means or treatment because: (1) the technology does not have final regulatory approval from the appropriate governmental regulatory bodies; (2) the scientific evidence does not permit conclusions concerning the effect of the technology on health outcomes; (3) the technology does not improve the health outcomes; (4) the technology is not as beneficial

as established alternatives; and (5) there is no showing that the claimed improvements were obtainable outside the investigational setting. Ultimately, Dr. Forston agreed with the August 1995 conclusion of the Office of Health Technology Assessment that, "further study is required to determine the role of stem-cell transplantation in multiple myeloma."

### THE STANDARD OF REVIEW

██ In *Firestone Tire and Rubber Company v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), the United States Supreme Court held that ERISA denial decisions are subject to de novo judicial review "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." If the plan does vest such discretionary authority in its administrator, then benefits decisions should be reviewed under the more deferential arbitrary and capricious standard. *Id.,* 489 U.S. at 115. The United States Court of Appeals for the Fifth Circuit uses "abuse of discretion" instead of "arbitrary and capricious" to describe the deferential alternative to de novo review. *Haubold v. Intermedics, Inc.,* 11 F.3d 1333, 1337 (5th Cir.1994); *Wildbur v. ARCO Chemical Company,* 974 F.2d 631 (5th Cir.1992).

██ In the instant case, BellSouth notes that Blue Cross has been delegated complete discretionary authority to interpret the terms and provisions of the MAP and its decisions are conclusive and binding. Therefore, says BellSouth, a deferential standard of review must be applied in the instant case. This court agrees. *See Jett v. Blue Cross and Blue Shield of Alabama,* 890 F.2d 1137, 1139 (11th Cir.1989) (granting the administrator exclusive right to interpret the provisions of a Plan requires application of a deferential standard).

BellSouth also points out that claims are paid out of self-funded MAP trusts, not Blue Cross assets, and that Blue Cross is compensated by the number of claims it processes. Thus, says BellSouth, Blue Cross has no incentive to deny meritorious claims and does not operate under any conflict of interest.

*See Brown v. Blue Cross & Blue Shield of Alabama, Inc.,* 898 F.2d 1556 (11th Cir.1990), *cert. denied,* 498 U.S. 1040, 111 S.Ct. 712, 112 L.Ed.2d 701 (1991) (finding conflict of interest where Blue Cross, acting as administrator of an ERISA Plan, provided insurance coverage to the employer; paid all claims out of its own assets and suffered the losses; and made all eligibility determinations). Again, this court agrees.

■ Where the abuse of discretion standard applies, this court must first determine the legally correct interpretation of the ERISA plan in question by considering whether the interpretation at issue is consistent with a fair reading of the plan; whether there is uniformity in the construction of the plan; and whether the interpretation results in any unanticipated costs to the plan. *Jordan v. Cameron Iron Works, Inc.,* 900 F.2d 53, 56 (5th Cir.), *cert. denied,* 498 U.S. 939, 111 S.Ct. 344, 112 L.Ed.2d 308 (1990). Only if this court determines that the administrator's interpretation was not legally correct must it consider whether that interpretation constituted an abuse of discretion. *Wildbur v. ARCO Chemical Company,* 974 F.2d at 638 (applying three factors to determine whether an interpretation constitutes an abuse of discretion).[4]

■ This court finds that the administrator's interpretation of MAP is consistent with a fair reading of its terms. Coverage for autologous bone marrow transplants and stem cell transplants is available under MAP only for three specified medical conditions: advanced Hodgkin's disease; acute leukemia; and non-Hodgkin's lymphomas. The plaintiff's condition, multiple myeloma, is simply not covered under MAP. The defendants have uniformly construed MAP to provide autologous bone marrow transplants and stem cell transplants only for those three medical conditions. Moreover, while the administrator's interpretation would not result in any unanticipated costs to MAP, it is clear that the interpretation urged by the plaintiff would. Therefore, finding that the adminis-

trator in the instant case has reached a legally correct interpretation of the MAP's terms, there is no basis for exploring whether that interpretation constituted an abuse of discretion. *Wildbur,* 974 F.2d at 638.

■ However, even if this court were to consider whether there had been an abuse of discretion by the administrator, this court would be compelled to conclude that there was no abuse. The terms of MAP clearly limit coverage for autologous bone marrow transplants and stem cell transplants to three specific medical conditions and the administrator's interpretation that multiple myeloma is not one of those conditions is consistent with the terms of MAP. Title 29 U.S.C. § 1104(a)(1)(D) of ERISA provides that plan administrators and fiduciaries will enforce employee benefit plans consistently and in accordance with their terms. The plaintiff has presented no evidence to support the contention that MAP has been interpreted in any manner not consistent with the administrator's current decision not to provide coverage for the treatment the plaintiff seeks. Finally, there has been no showing of bad faith on the part of BellSouth or Blue Cross. Thus, this court finds that there is no abuse of discretion, notwithstanding its finding that the administrator's interpretation of MAP's terms is legally correct.

### THE MATTER OF AMBIGUITY

■ The plaintiff argues that MAP's claims administration manual and summary plan description are ambiguous. This contention is based on the administrator's amendment to MAP dated October 25, 1993, which provided that coverage for both autologous bone marrow transplants and stem cell transplants was limited to the treatment of three specific medical conditions. If initially the limitation had been clear, argues plaintiff, then there would have been no need for the October 25, 1993, amendment. The plaintiff cites *Ramsey v. Colonial Life Insurance Company of America,* 12 F.3d 472 (5th Cir. 1994), and *Hansen v. Continental Insurance*

---

4. The three factors set forth in *Wildbur* to be considered by the court are: (1) the internal consistency of the plan under the administrator's interpretation; (2) any relevant regulations formulated by the appropriate administrative agencies; and (3) the factual background of the decision and where there is any indication of lack of good faith.

*Company,* 940 F.2d 971 (5th Cir.1991), in support of the proposition that the rule of *contra proferentum* be applied in the instant case. This rule provides that terms which remain ambiguous after applying ordinary principles of contract interpretation are to be strictly construed in favor of the insured. In the instant case, the plaintiff contends that only autologous bone marrow transplants were limited to three specific medical conditions, not the stem cell rescue procedure. These are separate and distinct procedures, says plaintiff, and both should have been limited specifically to the three specific medical conditions by the claims administration manual and the summary plan description if that was the way the MAP was to be interpreted. Otherwise, says plaintiff, there is ambiguity.

The defendants respond that the terms of MAP are clear and unambiguous. Coverage for multiple myeloma has never been provided under MAP either before or after the October 23, 1993, amendment. In order to be ambiguous, say defendants, the summary plan description language must be subject to at least two alternative interpretations. There is no way, say defendants, to interpret the terms of MAP to provide coverage for high dose chemotherapy supported either by an autologous bone marrow transplant or a peripheral stem cell transplant for multiple myeloma.

Defendants argue that the October 25, 1993, amendment is consistent with and did not change the coverage provided by MAP. Moreover, say defendants, an amendment or modification to an ERISA plan is binding on a beneficiary notwithstanding lack of notice where there is no showing that the amendment was concealed or that the beneficiary suffered prejudice by relying on the absence of the amendment. *Godwin v. Sun Life Assurance Company of Canada,* 980 F.2d 323, 328 (5th Cir.1992). The defendants note that the plaintiff received conventional treatment under MAP from and after his diagnosis in 1992. In April of 1994, the possibility of an allogenic bone marrow transplant, a procedure covered by MAP, was explored and abandoned. The matter of an autologous transplant was not raised until February of 1995. The plaintiff was informed in February, say defendants, and has been consistently told thereafter that MAP will not pay for this type transplant.

Applying the abuse of discretion standard, argue the defendants, this court is bound by the administrator's interpretation of MAP's terms, ambiguous or not, as long as that interpretation is reasonable. *James v. Louisiana Laborers Health & Welfare Fund,* 29 F.3d 1029, 1033 (5th Cir.1995) (finding Fund's interpretation of its terms fair and reasonable even though it relied on state law to bolster the interpretation). Defendants note that *Ramsey* and *Hansen* relied on by the plaintiff apply the non-deferential or de novo standard of review, the respective courts finding that the plan administrators in those cases had not been granted the discretionary authority to interpret the plan.

This court finds persuasive the findings of Dr. Forston, the Assistant Medical Director for Blue Cross Blue Shield of Alabama. In his letter denying the plaintiff's administrative appeal on November 10, 1995, Dr. Forston explains the administrator's position with regard to autologous bone marrow transplants and stem cell transplants. Dr. Forston says that while the two procedures employ different methods of gathering bone marrow cells or stem cells, the two terms are otherwise interchangeable. Both procedures, says Dr. Forston, are forms of bone marrow transplants which seek to harvest stem cells from either bone marrow or peripheral blood for reinfusion into a patient's body after the administration of high dose chemotherapy. Additionally, as noted by Dr. Forston, the consent form signed by the plaintiff authorizing Dr. Broun's protocol clearly states that autologous transplantation means (to the patient) receiving back the patient's own stem cells collected either from peripheral blood or bone marrow.

Therefore, inasmuch as the administrator regards autologous bone marrow transplants and peripheral stem cell transplants as two forms of the same treatment, this court is persuaded that the administrator's interpretation of MAP's terms is reasonable. The summary plan description clearly provides that autologous bone marrow transplantation

is covered for only three specific medical conditions, even if "stem cell transplantation," another form of bone marrow transplantation, is not specifically mentioned. Therefore, this court finds no ambiguity in the summary plan description.[5] Furthermore, this court finds no concealment of the amendments to MAP or prejudicial reliance on the absence of the amendments by the plaintiff.

## IS THE TREATMENT EXPERIMENTAL OR INVESTIGATIVE?

The defendants argue that pursuant to MAP's claims administration manual, a treatment is experimental or investigative unless it is approved by Medicare, Blue Cross Blue Shield Association, and by Blue Cross Blue Shield of Alabama. The approval of all three is required, otherwise the treatment is experimental and subject to MAP's exclusion for experimental treatments. To date, say defendants, Medicare has neither approved nor disapproved of the treatment sought by the plaintiff as effective for multiple myeloma. Blue Cross Blue Shield Association, say defendants, has not approved high dose chemotherapy supported by a peripheral stem cell transplant as an effective treatment for multiple myeloma. However, under limited circumstances, say defendants, Blue Cross and Blue Shield of Alabama may approve the treatment as an alternative benefit under the plan provided for its own employees. Of course, the policies adopted by Blue Cross Blue Shield of Alabama pertaining to the plan it provides for its own employees is an entirely different matter and has no bearing on the BellSouth plan (MAP) being considered in the instant case.

Relying on the deposition testimony of Dr. E.R. Broun and several medical study papers, the plaintiff submits that HDC/PSCR is recognized as an effective treatment for multiple myeloma and that the defendants' contentions to the contrary are specious. However, According to Dr. Broun, the protocol which he is conducting at St. Louis University Medical Center is only a "Phase II" clinical study. Protocols, or clinical studies, evaluate various treatments for cancer patients and are organized into three phases. In Phase I, the new procedure is tried on human subjects for the first time, the aim being to determine maximum human tolerance to the treatment. In Phase II, therapies which have successfully passed Phase I are given to a larger group of individuals to determine if the procedure is efficacious for treatment of the disease. Phase III involves randomized clinical trials in which some patients receive the experimental treatment and others receive conventional treatment. The results are documented, analyzed and compared to assess the efficacy of the experimental treatment. *See Smith v. Office of CHAMPUS,* 66 F.3d 905, vacated on other grounds, 66 F.3d 915 (7th Cir.1995).

Dr. Broun says he expects to enroll 25 individuals in his protocol. Presently, he has enrolled 12 to 15 individuals and, according to Dr. Broun, five have been in remission for over two years. For three or four others, says Dr. Broun, it is too early to tell, but he is optimistic that HDC/PSCR will extend life expectancy from four to five years. However, Dr. Broun also explains that a 20% early mortality rate using HDC/PSCR for the cancers in his study would lead him to conclude that the protocol was not effective. At this time a 20% mortality rate is still possible, notwithstanding Dr. Broun's optimistic testimony. As a Phase II study in progress, Dr. Broun's protocol has yet to conclude that HDC/PSCR is efficacious for treatment of the cancers in his study.

The administrator has determined that HDC/PSCR falls within the criteria set forth in Dr. Forston's letter for finding a treatment experimental or investigative. Dr. Forston notes in his administrative appeal letter that there is yet no showing that the claimed improvements from administering HDC/PSCR are obtainable outside the investigational setting. The administrator's determination, then, has an objective basis, the absence of hard Phase III data and the absence of approval from Medicare, Blue Cross Blue Shield Association, and Blue Cross Blue Shield of Alabama. Once these

---

5. The plaintiff acknowledges that he did not have access to the claims administration manual.

Thus, he could not have relied on that document in support of his claim of ambiguity.

three entities approve the treatment, it will no longer be considered experimental under MAP. Therefore, this court is unable to conclude in the face of the evidence presented that Dr. Broun's protocol presents a sufficient basis for rejecting the administrator's determination on this issue at this time.

### DO MAP'S COVERAGE LIMITATIONS VIOLATE ADA?

The plaintiff amended his complaint to add a claim pursuant to the Americans with Disabilities Act of 1990, Title 42 U.S.C. § 12101, *et seq.* Succinctly stated, plaintiff alleges under ADA that MAP provides coverage for autologous bone marrow transplants and HDC/PSCR for other conditions; that HDC/PSCR is an accepted medical treatment for multiple myeloma; and that non-coverage of the plaintiff's condition, multiple myeloma, is discrimination based on the plaintiff's disability and a violation of ADA.

■ The defendants contend that the plaintiff has no standing under ADA because he is no longer an employee of Bell South. Inasmuch as no authority is submitted in support of this contention, this court rejects it. The plaintiff was covered by MAP when employed by BellSouth and any claim of discrimination he might have under ADA would be predicated on the administrator's interpretation of MAP and the treatment of the plaintiff's claim. All of this occurred while the plaintiff was still a full-time employee of BellSouth.

Next, the defendants note that the ADA has adopted Title VII's charge filing procedure for employment related claims.[6] Therefore, assert defendants, as a condition precedent to filing and ADA claim in this court, the plaintiff should have filed a charge with and received a right-to-sue letter from the Equal Employment Opportunity Commission or his ADA claim should be dismissed.

■ The general rule is that a litigant must exhaust administrative remedies as a prerequisite to invoking jurisdiction of the federal courts. However, one may avoid exhaustion by showing there will be irreparable harm if exhaustion is required. *Lewis v. Reagan,* 660 F.2d 124, 127 (5th Cir.1981); *Rhodes v. United States,* 574 F.2d 1179, 1181 (5th Cir.1978), citing *Renegotiation Board v. Bannercraft Clothing Company, Inc.,* 415 U.S. 1, 94 S.Ct. 1028, 39 L.Ed.2d 123 (1974). Where an administrative proceedings would unreasonably delay the action and create a risk of irreparable injury, the exhaustion requirement may be bypassed. *See Panola Land Buyers Association v. Shuman,* 762 F.2d 1550 (11th Cir.1985).

■ If the plaintiff here is required to exhaust his ADA claim administratively through the Equal Employment Opportunity Commission, valuable time will be lost. The treatment sought by the plaintiff may no longer be effective. Thus, the consequences to the plaintiff could be irreparable. Therefore, this court finds that the plaintiff in the instant case may proceed with his ADA claim without first exhausting the EEOC's administrative procedures.[7]

■ Notwithstanding this court's acceptance of the plaintiff's ADA claim, this court still finds no basis for it in the instant case. Employment discrimination is defined as "limiting, segregating, or classifying a job applicant or employee in a way that adversely affects the opportunities or status of such applicant or employee because of the disability of such applicant or employee." Title 42 U.S.C. § 12112(b)(1). In order to establish a prima facie case of employment discrimination based on disability under the ADA, the plaintiff must show, inter alia, that the adverse action was taken because of a disabili-

---

**6.** Title 42 U.S.C. § 12117 provides in part that, "the powers, remedies and procedures set forth in sections 2000e–4, 2000e–5, 2000e–6, 2000e–8, and 2000e–9 of this title shall be the powers, remedies and procedures this subchapter provides to the Commission, the Attorney General, or to any person alleging discrimination on the basis of disability...."

**7.** This court contacted the toll free telephone information line of the EEOC and was informed that due to the agency's very large backlog of cases a claimant would be provided a right-to-sue letter on request without an investigation and hearing. This would enable the claimant to proceed to federal court immediately. Apparently, plaintiff's counsel were unaware of this possibility.

ty. *See Chandler v. City of Dallas,* 2 F.3d 1385, 1390 (5th Cir.1993) (to qualify for relief under ADA, plaintiff must show adverse treatment solely because of handicap); *Stradley v. Lafourche Communications, Inc.,* 869 F.Supp. 442, 443 (E.D.La.1994) (same). This the plaintiff is unable to do. The administrator's decision to limit coverage under MAP occurred in January of 1990, two years before the plaintiff was diagnosed with multiple myeloma. Thereafter, in order to provide coverage for costly treatments and other medical procedures for its employees, Bell-South instituted STAP. This supplemental coverage required payment of a nominal premium and offered to pay for those procedures not covered by MAP. The plaintiff declined coverage under STAP. Furthermore, the defendants were not aware of the plaintiff's medical condition until March of 1992. Moreover, the plaintiff made no request for an autologous bone marrow transplant with high dose chemotherapy until February of 1995. Plaintiff's request for HCD/PSCR was rejected in October of 1995. All these events occurred long after the administrator limited HDC/PSCR treatment to three specific medical conditions. Therefore, this court is unpersuaded that the plaintiff could show a vital element of a prima facie case under ADA, that the defendants' actions were motivated by the plaintiff's medical condition or handicap. *Chandler,* at 1390.

The case relied upon by the plaintiff is also unpersuasive. *Henderson v. Bodine Aluminum, Inc.,* 70 F.3d 958 (8th Cir.1995), an ADA case, involved a dispute over whether high dose chemotherapy supported by an autologous bone marrow transplant was experimental. Unlike the instant case, the *Henderson* Court was not faced with the issue of coverage *vel non.* Coverage in *Henderson* was denied by the district court solely because the treatment was considered experimental. Since the evidence presented to the district court undermined the benefit plan's denial of coverage on the basis of the treatment being experimental, the Eighth Circuit granted injunctive relief, ordering that the treatment be administered, and remanded the case to the district court for resolution of the ADA issue.

The instant case presents a different picture. The MAP does not cover the treatment sought by the plaintiff unless it is being administered to treat any one of three specific medical conditions. Therefore, regardless of the experimental treatment exclusion contained in MAP, multiple myeloma clearly is not one of the covered medical conditions for which coverage is provided.

Furthermore, the plaintiff has presented insufficient evidence for this court to find any distinction between the plaintiff's condition and other cancers not covered by MAP. There has been no showing that multiple myeloma should be regarded by MAP in the same manner as Hodgkin's disease, leukemia, or non-Hodgkin's lymphoma. Moreover, there is no showing that the defendants attempted to avoid covering the plaintiff's condition. STAP was implemented for the very purpose of covering the type condition in question and the high cost treatments such conditions might require. The plaintiff declined coverage under STAP. No discriminatory policy prevented the plaintiff from becoming covered under STAP. Therefore, this court finds no basis for the plaintiff's ADA claim.

### THE PLAINTIFF'S REQUEST FOR INJUNCTIVE RELIEF

A preliminary injunction is an extraordinary remedy which should be granted only when a movant clearly carries the burden of persuasion on all four factors set forth in *Canal Authority v. Callaway,* 489 F.2d 567, 573 (5th Cir.1974). *See Black Fire Fighters Association v. City of Dallas, Texas,* 905 F.2d 63, 65 (5th Cir.1990); *Enterprise International, Inc. v. Corporacion Estatal Petrolera Ecuatoriana,* 762 F.2d 464, 472 (5th Cir.1985). The decision to grant a preliminary injunction is to be treated as the exception rather than the rule. *State of Texas v. Seatrain International, S.A.,* 518 F.2d 175, 179 (5th Cir.1975).

In *Canal Authority v. Callaway,* the Fifth Circuit held that a federal court must consider four factors when determining whether to issue a preliminary injunction:

(1) a substantial likelihood that plaintiff will prevail on the merits;

(2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted;

(3) that the threatened injury to the plaintiff outweighs the threatened harm the injunction may do to the defendant; and

(4) that granting the preliminary injunction will not disserve the public interest.

See also *Doe v. Duncanville Independent School District,* 994 F.2d 160, 163 (5th Cir. 1993); *Mississippi Power and Light v. United Gas Pipe Line,* 760 F.2d 618 (5th Cir. 1985).

### 1. *Substantial Likelihood of Success on the Merits*

■ This court is unpersuaded that the plaintiff can show a substantial likelihood that he will prevail on the merits of his ERISA claim. The pivotal question before this court is whether the specific treatment sought by the plaintiff, HCD/PSCR, is covered by the health insurance provided by plaintiff's employer. A positive answer to this question is vital to the plaintiff's ability to succeed on the merits of his claim. However, as this court has already concluded, MAP provides coverage for this type treatment only for three specific medical conditions. The plain meaning of the MAP's terms is that the plaintiff's condition, multiple myeloma, is not covered by MAP for HDC/PSCR. Thus, this court is unable to conclude that there is a substantial likelihood that the plaintiff will succeed on the merits of his ERISA claim. *See Mire v. Blue Cross/ Blue Shield of Florida,* 43 F.3d 567 (11th Cir.1994) (finding that a group health policy covered HDC/PSCR for only specific diseases not including the plaintiff's ovarian cancer).

Furthermore, for the reasons above stated, this court finds that there is no substantial likelihood that the plaintiff will prevail on the merits of his ADA claim. Thus, the injunctive relief sought by the plaintiff must be denied. (A movant must carry the burden of persuasion on each of the elements of the four-prong test). *See* 7 James W. Moore et al., *Moore's Federal Practice,* ¶ 65.04[1] (2d ed. 1993) (unlike other circuits which hold that no single factor is determinative, the

Fifth Circuit requires the movant to carry the burden of proof on each factor).

### 2. *Irreparable Harm; Balance of Harms; and the Public Interest*

■ Otherwise, this court finds that the plaintiff has shown that he likely will suffer irreparable harm inasmuch as he may miss the opportunity for a life-extending treatment. This harm far outweighs any monetary harm the defendants may suffer. Additionally, this court finds that the public interest would not be ill-served if an injunction were granted. Nevertheless, this court denies injunctive relief today because the plaintiff cannot show that he is likely to succeed on the merits of his ERISA and ADA claims.

Therefore, the plaintiff's request for a preliminary injunction to require the BellSouth Medical Assistance Plan and the administrator of MAP, Blue Cross Blue Shield of Alabama to provide insurance coverage for high dose chemotherapy with peripheral stem cell rescue (HDC/PSCR) is hereby denied.

**SO ORDERED AND ADJUDGED.**