**Valerie SMITH, Plaintiff,**

v.

**NEWPORT NEWS SHIPBUILDING HEALTH PLAN, INC., Defendant.**

**No. CIV. A. 4:01CV47.**

United States District Court, E.D. Virginia, Newport News Division.

June 18, 2001.

Richard D. Carter, David S. Panzer, Carter & Coleman, Alexandria, VA, for Plaintiff.

Hill B. Wellford, Jr., Edwin F. Farren, IV, Hunton & Williams, Richmond, VA, for Defendant.

## ORDER AND OPINION

FRIEDMAN, District Judge.

On May 30, 2001, the Court heard oral argument regarding Plaintiff Valerie Smith's Motion for Preliminary Injunction or in the Alternative for Expedited Trial. Plaintiff suffers from Stage II breast cancer which has not yet metastasized. She has requested that Defendant Newport News Shipbuilding Health Plan, Inc. (the "Plan") provide a certification of insurance coverage so that she can receive High Dose Chemotherapy ("HDCT") with Peripheral Stem Cell Support ("PSCS") or Autologuos Hematopoietic Support ("AHS") treatment for her cancer. The Plan's claim administrator, Connecticut General Life Insurance Company and its related companies ("CIGNA"), has denied Plaintiff's requests for pre-authorization of coverage for this treatment, which CIGNA has deemed excluded from the Plan as experimental, investigatory, and not medically necessary. Plaintiff seeks an order enjoining Defendant to issue the certification of insurance coverage necessary for her doctors to go forward with HDCT treatment. In accordance with the Court's directive, the parties filed supplementary briefs concerning Plaintiff's motion on June 4, 2001. For the reasons set forth below, Plaintiff's request for a preliminary injunction hereby is **GRANTED.**

## I. Factual and Procedural Background

Ms. Smith is a 42 year-old employee of Newport News Shipbuilding, Inc. ("NNSI"). She is a participant in the Plan, which is self funded through contributions by NNSI and its current and former employees. Gettas Decl., Ex. 2, at General Information 11. In June 2000, Ms. Smith presented a palpable lump in her right breast, and subsequently was diagnosed with Stage II breast cancer.[1]

---

1. Breast cancer is classified into stages for purposes of prognosis and treatment. Stage I cancer is characterized by small tumors within the breast, with no lymph node involvement. Stage II breast cancer involves larger tumors from 2–5 cm in diameter and/or with

She underwent a mastectomy and began adjuvant standard dose chemotherapy ("SDCT") which has resulted in the complete remission of her breast cancer. The Plan has paid for the medical expenses associated with her mastectomy and SDCT.

Although her cancer currently is in remission, it appears that Plaintiff is at high risk for relapse due to her age, multiple node involvement, and other negative prognosis factors. Plaintiff's primary concern is that without aggressive therapy the cancer will metastasize. Vredenburgh Decl., at ¶ 5. According to Plaintiff's oncologist, metastatic breast cancer is almost categorically incurable, with a median survival rate of approximately one year. *Id.* Plaintiff claims that HDCT offers her the best chance for progression free survival. She was scheduled to be admitted to the Duke University Medical Center ("Duke") in January 2001 for HDCT treatment, but Duke could not admit her until she provided the hospital with a pre-certification from the Plan that the treatment will be covered by insurance. Thus far, the Plan, as administered by CIGNA, has refused to pre-certify coverage for HDCT treatment for Ms. Smith.

The Plan provides that for an expense to be covered, it must, *inter alia*, be "Necessary for the treatment of an injury or sickness." Gettas Decl, Ex. 2, p. 14 (Summary Plan Description ("SPD")). Services that are not medically necessary are not covered. *Id.*, at 21. The Plan defines "Necessary" as follows:

A service or supply is Necessary if it is for the diagnosis, care or treatment of a physical or mental condition and widely accepted professionally in the U.S. as effective, appropriate, and essential, based upon recognized standards of the health care specialty involved.

*Id.*, at 40. CIGNA argues, and the Plaintiff appears to concede, that experimental/investigative procedures are not Necessary and, therefore, are excluded from coverage. The Plan defines "Experimental/Investigative Procedures" as follows:

[A]ny service or supply which is determined to be experimental or investigative at [CIGNA's] sole discretion. The following four criteria in exercising its discretion will apply:

1. Any supply or drug must have received final approval to market by the United States Food and Drug Administration;

2. There must be sufficient information in the peer reviewed medical and scientific literature to enable [CIGNA] to make conclusions about safety and efficacy;

3. The available scientific evidence must demonstrate a beneficial effect on health outcomes outside a research setting; and

4. The service or supply must be as safe and effective outside a research setting as existing diagnostic or therapeutic alternatives.

*Id.*, at 39.

In the 1980s and 1990s, the search for better breast cancer treatments led to increased use of chemotherapy, both in terms of drugs utilized and dosages administered.[2] The phrase "high dose chemo-

---

lymph node involvement. In Stage III, the tumor measures more than 5 cm and may involve a great number of lymph nodes. In Stage IV, the cancer has spread or metastasized to other organs of the body. *Glauser–Nagy v. Medical Mutual of Ohio,* 987 F.Supp. 1002, 1006 n. 1 (N.D.Ohio 1997).

2. Patricia C. Kuszler, FINANCING CLINICAL RESEARCH AND EXPERIMENTAL THERAPIES: PAYMENT DUE, BUT FROM WHOM?, 3 DePaul J. Health Care L. 441, 457 (2000).

therapy" refers to chemotherapy at doses that are so toxic to the patient's bone marrow that the patient could not survive without infusions of stem cells derived from either the bone marrow or peripheral blood. In the AHS procedure, stem cells are withdrawn from the marrow, frozen and then later re-infused into the patient. In the PSCS procedure, medication is used to force stem cells out of the marrow into the peripheral blood stream where they can be retrieved through a blood draw. PSCS has the advantage of sparing the patient an invasive bone marrow aspiration for the initial harvesting of marrow cells.[3] Plaintiff alleges that HDCT with PSCS is not only more effective than SDCT in producing complete remissions in breast cancer patients, but HDCT has the added advantage of permitting the patient to be off treatment and without need for additional chemotherapy treatments. The mortality rate related to the toxicity of HDCT, as administered at Duke, currently is between 1% and 3%. Vredenburgh Supp. Decl., at ¶ 8.

Plaintiff's local oncologist, Dr. Elizabeth Harden, recommended HDCT with PSCS as the best treatment available for Ms. Smith's breast cancer. Dr. James J. Vredenburgh, Assistant Professor of Medicine at Duke, then evaluated Ms. Smith. On or about January 5, 2001, Dr. Vredenburgh requested that the Plan pre-authorize coverage to permit Plaintiff to undergo HDCT with PSCS at Duke. Gettas Decl., ¶ 5. On January 11, 2001, Dr. Nicholas Gettas, a Medical Director at CIGNA, responded that CIGNA could not authorize coverage for HDCT because the treatment fails to "meet our standards for medical necessity" for the following reasons: (1) demonstrated literature and past reviews indicate that autologuous stem cell transplants for breast cancer are "investigation-al and experimental," and (2) experimental and investigative procedures are not covered under the Plan. Gettas Decl., at 4. This letter advised Dr. Vredenburgh of the patient's right to request reconsideration of the denial.

Duke appealed CIGNA's initial denial of pre-authorized coverage. On January 26, 2001, Dr. James Rollins of CIGNA informed Dr. Vredenburgh of his decision to uphold the original denial of benefits. Dr. Rollins reiterated that autologous stem cell bone marrow transplant is experimental/investigative. In this letter, Dr. Rollins advised Plaintiff that her appeal had been forwarded to CIGNA's LIFESOURCE Transplant Program and Clinical Decision Support Inquiry Unit and that an external review of the request was performed. CIGNA refers for external review requests for coverage such as Ms. Smith's to the Medical Care Management Corporation, a company unaffiliated with CIGNA, that administers the Medical Care Ombudsman Program ("MCOP"). MCOP selects medical expert reviewers on a rotating basis from a panel of physicians within particular medical specialties. Gettas Decl., ¶ 6–7.

The independent reviewer who, upon referral from MCOP, first considered Ms. Smith's case was Dr. Christopher E. Desch. Desch Decl., ¶¶ 1–2. Dr. Desch is the Medical Director of the Virginia Cancer Treatment Centers and Director of Clinical Research for the Virginia Cancer Institute. Id., ¶ 1. On January 21, 2001, Dr. Desch completed his review of Plaintiff's request. Id., Ex. 2. It was Dr. Desch's opinion that "there is no convincing evidence that the high-dose chemotherapy with peripheral stem cell support proposed for Ms. Smith will improve her health outcome over what is to be expected

---

3. *Id,* at 457 n. 125.

from conventional chemotherapy." *Id.*, at ¶ 6. Dr. Desch's report did not accompany CIGNA's January 26, 2001 denial of coverage.

Although Dr. Desch concluded that "the health benefits of [HDCT] are not clear for this treatment for this patient," his report acknowledges that "[h]igh dose chemotherapy has been a promising treatment for high-risk breast cancer." Citing a 1993 study conducted by doctors at Duke, including Plaintiff's oncologist Dr. Vredenburgh, Dr. Desch stated that "[d]ata from Duke show a longer disease free survival in women with more than 10 nodes compared to a non-concurrent group of historical controls."[4] Dr. Desch also referred to a 1995 study that showed a high proportion of patients disease free at two years after receiving HDCT.[5] Dr. Desch, however, suggested that the benefits of HDCT shown in the Peters Study and Bearman Study may be attributable to selection bias.[6] Finally, Dr. Desch acknowledged that a 1998 Dutch study of 885 women who were randomized to receive HDCT versus intermediate doses of chemotherapy produced preliminary findings in the first 284 patients demonstrating a disease-free survival rate of 77% for HDCT patients ver-sus 62% for intermediate dose patients and a significantly greater overall survival rate for women in the high-dose arm of the study.[7] Dr. Desch clarified, however, that analysis of all patients in the Dutch Study failed to demonstrate a significantly greater overall survival rate for those patients in the HDCT arm. Finally, without elaboration, Dr. Desch referred to recent data from the 1999 annual meeting of the American Society for Clinical Oncology ("ASCO") that "cast some doubt on the usefulness of [HDCT] for women with high risk for recurrence."

On February 2, 2001, Plaintiff's counsel sent an appeal packet to CIGNA again requesting that the denial of coverage be reconsidered. Plaintiff's Ex. 4. In support of this appeal, Ms. Smith refers to an article which reported that between January 1, 1989 and June 30, 1995, 5,886 breast cancer patients receiving HDCT with AHS were registered with the Autologous Blood and Marrow Registry of North America ("ABMTR").[8] According to ABMTR statistics cited by the Plaintiff, by 1998 the number of persons with breast cancer receiving blood and marrow transplants in North America had risen to over 7,000. Plaintiff's Ex. 4. Plaintiff also included in

4.  Peters W.P, Ross M., Vredenburgh J.J., *et al.*, HIGH–DOSE CHEMOTHERAPY AND AUTOLOGOUS BONE MARROW SUPPORT AS CONSOLIDATION AFTER STANDARD–DOSE ADJUVANT THERAPY FOR HIGH RISK PRIMARY BREAST CANCER, 11 J. Clin. Oncology 1132 (1993) (the "Peters Study").

5.  Bearman SI, Overmoyer B.A., Bolwell, B.G., *et al.*, HIGH–DOSE CHEMOTHERAPY WITH AUTOLOGUOS PERIPHERAL PROGENDOR CELLS FOR STAGE II/III BREAST CANCER IN PATIENTS WITH 4–9 POSITIVE AXILLARY LYMPH NODES, 14 Proc. ASCO 133 (1995) ("Bearman Study").

6.  Even the authors of the Peters Study recognized that it is necessary to view their findings with caution because the study compared the results of HDCT treatments with historical populations rather than used randomized controls as would be done in a Phase III study.

7.  Rodenhuis S., Richel DJ, van der Wall E., *et al.*, RANDOMIZED TRIAL OF HIGH–DOSE CHEMOTHERAPY AND HAEMOPOIETIC PROGENITOR CELL SUPPORT IN OPERABLE BREAST CANCER WITH EXTENSIVE AXILLARY NODE INVOLVEMENT, 352 Lancon 515 (1998) (the "Dutch Study").

8.  Antman K.H., *et al.*, HIGH–DOSE CHEMOTHERAPY WITH AUTOLOGOUS HEMATOPOIETIC STEM–CELL SUPPORT FOR BREAST CANCER IN NORTH AMERICA, 15 J. Clin. Onc.1970, 1871 (May 1997).

this appeal packet copies of several articles and graphs, most of which are dated from the early 1990s, regarding the relative effectiveness of HDCT over SDCT.

CIGNA sent this appeal to MCOP for referral to a second independent medical expert. This second review was conducted by Dr. Michael L. Grossbard. Grossbard Decl., ¶ 2. Dr. Grossbard is the Chief of Hematology–Oncology at St. Luke's–Roosevelt Hospital Center and at Beth Israel Medical Center in New York and is an Associate Professor of Clinical Medicine at the Columbia University College of Physicians and Surgeons. *Id.*, at ¶ 1. On February 11, 2001, Dr. Grossbard sent a report to CIGNA in which he concluded that "there is no definitive data from randomized clinical trials to indicate that the use of high dose chemotherapy in this patient will lead to a better outcome than the use of standard doses adjuvant chemotherapy." Grossbard Ex. 2. Dr. Grossbard opined that "[t]he majority of practicing oncologists would no longer consider high dose therapy to be an appropriate standard of care for patents with stage II/III breast cancer." Dr. Grossbard acknowledged, however, that HDCT "is likely to be safe and able to be conducted at experienced centers with a mortality of less than 5%."

In addition to discussing the Peters Study described above, Dr. Grossbard's report referred to data presented at the 1999 ASCO annual meeting concerning the potential benefits of HDCT in the treatment of breast cancer. At this meeting, Dr. Peters and his colleagues with the Cancer and Leukemia Group B ("CALGB") presented early results of their Phase III randomized study which indicated that "a patient receiving the high-dose therapy has about a 68% chance of being alive without breast cancer at three years, compared with a 64% chance for a patient receiving the intermediate-dose therapy." [9] Dr. Grossbard opined that this was not a statistically significant difference in overall survival rates. Dr. Grossbard also noted that a Scandinavian study conducted by Dr. Jonas Bergh indicated that there is no overall benefit to patents receiving HDCT over those who received chemotherapy doses "tailored" to their blood counts. Although Dr. Grossbard does not refer to this statistic in his report, the press release from the 1999 ASCO meeting to which he referred estimates that "more than 12,000 women with breast cancer in the United States have undergone bone marrow transplantation since the mid–1980s." [10]

On February 13, 2001, CIGNA notified Plaintiff that its Appeals Committee would be meeting on February 15, 2001 to discuss her case. Plaintiff, her counsel, and Dr. Vredenburgh participated, via teleconference, in this meeting. Gettas Decl., ¶ 11. Dr. Gettas avers that during the course of considering Plaintiff's appeal, the Appeals Committee reviewed the reports of Dr. Desch and Dr. Grossbard, the February 2, 2001 appeal packet prepared by Plaintiff's counsel, and the information provided by Dr. Vredenburgh and Plaintiff's counsel during the meeting. *Id.*, ¶ 12. On February 22, 2001, CIGNA again denied Plaintiff's appeal. Plaintiff's Ex. 5. CIGNA explained that it had determined to uphold its decision to deny coverage for an "autologous stem cell transplant with

9. *See* ASCO, MIXED RESULTS FROM EARLY DATA IN HIGH–DOSE CHEMOTHERAPY IN BREAST CANCER, at <www.asco.org/people/nr/html/99am/mon_BMT.htm>.

10. *Id.*

high dose chemotherapy for the treatment of stage II/III breast cancer" because the procedure was not medically necessary and was experimental/investigative.

On March 19, 2001, Plaintiff's counsel sent another letter to CIGNA requesting reconsideration of the denial of coverage. This letter was accompanied by a copy of a September 6, 2000 article by Dr. Karen Antman of the Columbia University Herbert Irving Comprehensive Cancer Center. Plaintiff's Ex. 6.[11] In this article, Dr. Antman found that the two Phase III studies containing the most relevant comparisons of HDCT to lower dose chemotherapy treatments in breast cancer patients are the CALGB Study and the Dutch Study. According to Dr. Antman, "both of these have trends in relapse-free survival favouring high-dose therapy" at three years. Dr. Antman acknowledges, however, that "[t]o determine whether the trend in relapse rates will continue and eventually produce significant differences in disease-free and overall survival will require several years of further follow-up."

CIGNA forwarded this letter and its enclosures to Dr. Grossbard for a second review and report. Gettas Decl., at 17. On March 26, 2001, Dr. Grossbard responded that this additional information did not alter his opinion that "the use of high dose chemotherapy for the treatment of Ms. Smith and other patients with stage II/III breast cancer and 10 positive lymph nodes is investigational and has not been shown definitively in randomized clinical trials to be more beneficial than the use of conventional doses of adjuvant chemotherapy." Grossbard Decl., Ex. 3. Dr. Grossbard stated, for example, that although the results of the Dutch Study cited in Dr. Antman's article were "positive," the data from this study "shows a 72% 3 year [dis-

ease free survival rate] in the high dose arm vs. 65% in the standard dose arm, a difference that is not statistically significant at this point in the follow-up."

On March 27, 2001, CIGNA informed Plaintiff's counsel that its decision regarding denial of coverage remained unchanged. Accompanying this letter, CIGNA provided Plaintiff, for the first time, copies of Dr. Grossbard's February 11, 2001 and March 26, 2001 reports. Plaintiff's Ex. 8. By letter dated April 5, 2001, Plaintiff's counsel wrote to CIGNA complaining that the MCOP has been criticized for bias in the past. Plaintiff's Ex. 9.

Her appeals having failed to persuade CIGNA to approve coverage for HDCT treatment at Duke, Ms. Smith filed suit in federal court on May 7, 2001. Count One of Plaintiff's complaint alleges that Defendant violated the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1132 and 1133, by failing to provide her with (1) adequate notice of the basis for its denial of her claim and (2) a reasonable opportunity for a full and fair review of the decision to deny her claim. Count Two requests a declaratory judgment finding that the requested HDCT treatment is covered under the Plan and does not fall within the Plan's exclusions for experimental/investigatory procedures and procedures that are not medically necessary.

## II. Discussion

Plaintiff petitions the Court, pursuant to Federal Rule of Civil Procedure ("Rule") 65(a), for the issuance of a preliminary injunction. In determining whether temporary injunctive relief is appropriate, the Court must consider the "flexible interplay" between the following four factors:

11. Antman K.H., A CRITIQUE OF THE ELEVEN RANDOMIZED TRIALS OF HIGH-

DOSE CHEMOTHERAPY FOR BREAST CANCER, 37 Eur. J. Cancer 173 (Sept.2000).

(1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied;

(2) the likelihood of harm to the defendant if the requested relief is granted;

(3) the likelihood that the plaintiff will succeed on the merits; and

(4) the public interest.

*Direx Israel, Ltd. v. Breakthrough Medical Corp.*, 952 F.2d 802, 812 (4th Cir.1991), *quoting Rum Creek Coal Sales, Inc. v. Caperton*, 926 F.2d 353, 359 (4th Cir.1991); *Blackwelder Furniture Co. v. Seilig Mfg. Co., Inc.*, 550 F.2d 189, 193 (4th Cir.1977). The two most critical factors in determining the appropriateness of preliminary injunctive relief are "the need of protection to the plaintiff as contrasted with probable injury to the defendant." *Blackwelder*, 550 F.2d at 193 (citation omitted); *Wilson v. CHAMPUS*, 866 F.Supp. 903, 905 (E.D.Va.1994) (J. Clarke), *aff'd* 65 F.3d 361 (4th Cir.1995) ("these factors are not weighted equally: the 'balance of the hardships' inquiry is the most important determination"). "If a decided imbalance of hardship should appear in plaintiff's favor ... it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation." *Id*, at 195. In other words, "[t]he importance of probability of success increases as the probability of irreparable injury diminishes." *Id.*

■ Further, "[t]his circuit differentiates between requests for preliminary injunctive relief that seek merely to maintain the status quo and requests that seek 'mandatory' relief that in some fashion disturbs the status quo, especially where that relief would in effect operate to decide the merits of the case in favor of the moving party." *Simpson v. City of Hampton, Virginia*, 919 F.Supp. 212, 214 (E.D.Va.1996)

(J. Morgan). Accordingly, "[t]he moving party bears a heavier burden when seeking mandatory relief." *Id.* There is no question that Plaintiff's request that the Plan be required to pre-authorize coverage for HDCT treatment, which has been previously denied, is a request for a mandatory injunction. *See Graham*, 130 F.3d at 295 (action seeking to compel insurance company to pre-certify coverage for HDCT deemed motion for mandatory preliminary injunction).

## A. Balance of the Hardships

■ The Court finds that the balance of the relative hardships that the parties can be expected to suffer depending on whether or not preliminary injunctive relief is granted weighs heavily in favor of the Plaintiff. Ms. Smith is suffering from Stage II breast cancer, which is a life threatening disease. According to the declaration filed by Plaintiff's oncologist, absent aggressive therapy Plaintiff's cancer likely will metastasize, at which point the disease is virtually incurable. Vredenburgh Decl., ¶ 5. Ms. Smith was originally scheduled to begin HDCT treatment at Duke sixth months ago. Plaintiff argues that if the Court denies her request for a preliminary injunction, her doctors likely will have no choice but cycle her on maintenance standard-dose chemotherapy, thereby potentially depriving her of the opportunity to receive HDCT.

Defendant is correct that district courts in other jurisdictions have found that breast cancer patients whose insurers have denied coverage for HDCT cannot establish the existence of an irreparable injury because there is no clear medical evidence demonstrating that HDCT is more effective than the SDCT that the patient would receive absent coverage. *See, e.g., Zervos v. Verizon New York, Inc.*, 2001 WL 253377, *8 (S.D.N.Y. Mar.14, 2001) ("Since

plaintiff cannot demonstrate that HDCT will be more beneficial to him than continuation of conventional chemotherapy, he has not sustained his burden of proving to this Court that he will be irreparably harmed if this Court does not order defendants to pay for HDCT rather than conventional chemotherapy"). Thus, cases such as *Zervos* have found that preliminary injunctive relief was not appropriate because the plaintiff could not establish that he or she ultimately would be worse off with SDCT as opposed to HDCT.

■ The district court's approach in *Zervos*, however, does not comport with the preliminary injunction standard applicable in this circuit. Under *Blackwelder*, this Court must consider the *interim* hardship that the Plaintiff is likely to suffer should preliminary injunctive relief not be granted with the perspective that she ultimately will prevail on the merits. "Where the questions presented by an application for an interlocutory injunction are grave, and the injury to the moving party will be certain and irreparable, *if the application be denied and the final decree be in his favor*, while if the injunction be granted the injury to the opposing party, even if the final decree be in his favor, will be inconsiderable, or may be adequately indemnified by a bond, *the injunction usually will be granted*." *Blackwelder*, 550 F.2d at 194, *quoting Ohio Oil Co. v. Conway*, 279 U.S. 813, 815, 49 S.Ct. 256, 257, 73 L.Ed. 972 (1929) (emphasis added).

In a well-reasoned opinion concerning a case factually similar to the instant matter, Judge Clarke found that the "balance of hardship analysis overwhelmingly favors" a plaintiff suffering from Stage II breast cancer whose oncologist averred that she must begin HDCT immediately or risk the window of opportunity for effective HDCT closing. *Wilson*, 866 F.Supp. at 903. In *Wilson*, the defendant was enjoined from denying coverage for the HDCT treatment that the plaintiff was scheduled to undergo three days after the preliminary injunction hearing. *Id.* at 904. Ms. Smith, unfortunately, finds herself in even more dire circumstances since the date on which she was to begin HDCT treatment passed six months ago. In light of Ms. Smith's serious, potentially fatal medical condition, the Court finds that she will be irreparably harmed if she is delayed any further in obtaining the HDCT treatment prescribed by her oncologists. *Henderson v. Bodine Aluminum, Inc.*, 70 F.3d 958, 961 (district court abused discretion in denying preliminary injunction where plaintiff "faced missing perhaps her only opportunity for HDCT if injunctive relief were not granted; given the grave and progressive nature of [plaintiff's] illness, this constitutes irreparable harm").[12]

**B. Likelihood of Success on the Merits**

Plaintiff asserts two causes of action. First, Plaintiff alleges that Defendant failed to provide her with adequate written notice setting forth the basis for its denial of her claim for pre-authorization of coverage for HDCT treatment and failed to provide her with a reasonable opportunity for a full and fair review of this denial, all in violation of Sections 1132 and 1133 of ERISA and the applicable federal regulations. Second, Plaintiff seeks a declaratory judgment interpreting the Plan so as to provide coverage for HDCT. As discussed above, the balance of the hardships strong-

---

**12.** Defendant wisely does not attempt to argue that any injury it may face due to the Court's issuance of a preliminary injunction outweighs the harm confronting Ms. Smith should the injunction not issue. Judge Clarke framed the issue concisely, "[Defendant] may lose some money; the Plaintiff may lose her life." *Wilson*, 866 F.Supp. at 906.

ly favors the Plaintiff. Therefore, in accordance with the *Blackwelder* standard, the Court shall address whether Plaintiff has demonstrated that there exists a substantial question on the merits of either of these claims.

### 1. ERISA Procedures

■ Plaintiff alleges that CIGNA failed to comply with ERISA's procedural requirements related to denials of claims for coverage. Under ERISA, "every employee benefit plan shall (1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim." 29 U.S.C. § 1133.

The applicable regulations elaborate that notice of denial under Section 1133 must provide "(1) The specific reason or reasons for the denial; (2) Specific reference to pertinent plan provisions on which the denial is based; (3) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; and (4) Appropriate information as to the steps to be taken if the participant or beneficiary wishes to submit his or her claim for review." 29 C.F.R. § 2560.503–1(f). The Plan expressly adopts these requirements. Plaintiff's Ex. 12, pp. 32–33, ¶ 5.02(f).

The regulations also require plans to provide an internal appeals process. Every plan must "establish and maintain a procedure by which a claimant or his duly authorized representative has a reasonable opportunity to appeal a denied claim to an appropriate named fiduciary, and under which a full and fair review of the claim and its denial may be obtained." 29 C.F.R. 2560.503–1(g)(1).

The Court finds that, at this stage in the litigation, Plaintiff has not established that there is a serious and substantial question with respect to the merits of her ERISA claim. The Fourth Circuit has held repeatedly that "substantial compliance with the spirit of the regulation will suffice, for 'not all procedural defects will invalidate a plan administrator's decision.'" *Ellis v. Metropolitan Life Ins. Co.*, 126 F.3d 228, 235 (4th Cir.1997), *quoting Brogan v. Holland*, 105 F.3d 158, 165 (4th Cir.1997). At a minimum, it appears that the Defendant and CIGNA substantially complied with ERISA's requirements that Ms. Smith be provided with notice regarding the basis for the denial of her claim and the opportunity for a full and fair review of that denial.

Plaintiff argues that CIGNA's January 11, 2001 letter originally denying her request for pre-certification of coverage for HDCT failed to satisfy ERISA's notice requirements because it did not explain why the plan administrator concluded that the requested procedure was medically unnecessary and failed to advise Ms. Smith of what evidence she would need to submit to demonstrate a right to coverage. Based upon the record currently before the Court, Plaintiff does not appear to be correct.

The January 11, 2001 letter is clear that CIGNA declined to authorize the requested procedures because it found that they were "medically unnecessary" for the following reasons: "(1) Demonstrated literature and past reviews indicate that autologuous stem cell transplants for the treatment of breast cancer continues to be investigational and experimental. (2) According to the terms of the above partici-

pant's employer's contract, experimental and investigative procedures are not a covered benefit." Plaintiff's Ex. 2. The letter also advised Ms. Smith's oncologist that she had the right to request reconsideration of this decision. Thus, Ms. Smith was (1) provided with the specific reason for the denial—the procedure was deemed medically unnecessary; (2) was advised of the basis in the Plan for denial—the Plan's experimental/investigative exclusion; and (3) received appropriate information as to the procedure for submitting an appeal.

▬▬▬ With respect to Plaintiff's claim that Defendant failed to provide her with a description of information necessary for her to perfect her claim, the law is clear that as fiduciaries CIGNA and the Defendant are not under an obligation to inform Plaintiff of what she needs to tell them in order to obtain coverage. *Ellis*, 126 F.3d at 236. Rather, this element "is only implicated when there remain unresolved, material factual questions about which a plan administrator or fiduciary must have information in order to review the denial of a claim." *Id.* CIGNA satisfied the purpose of ERISA's notice requirements, which is to "insure that when a claimant appeals a denial to the plan administrator, he will be able to address the determinative issues and have a fair chance to present his case." As discussed below, it is clear that Plaintiff was sufficiently aware of the issues related to the denial of coverage for HDCT treatment to make a full presentation of her position during the administrative appeal process.

The Court now turns to the alleged insufficiency of CIGNA's administrative appeals process. The regulations require that the review procedure must allow a claimant or her representative to "(i) Request a review upon written application to the plan; (ii) Review pertinent documents;

and (iii) Submit issues and comments in writing." 29 C.F.R. § 2560.503–1(g)(1). During the course of the nearly four month long appeals process related to Ms. Smith's request for coverage, all of these requirements appear, at a minimum, to have been substantially met.

Ms. Smith's initial appeal was forwarded to Dr. Desch for an independent review through the MCOP. On February 2, 2001, Plaintiff's counsel submitted to CIGNA a detailed statement of her position with respect to the non-experimental and effective nature of HDCT which was supported by numerous attachments, including letters from doctors and studies concerning HDCT. This packet was forwarded to Dr. Grossbard who conducted a second independent review of Plaintiff's claim. On February 15, Plaintiff, her counsel, and her oncologist participated in a conference call with CIGNA's Appeals Committee during which Plaintiff had an additional opportunity to explain her position. On March 19, 2001, Plaintiff submitted yet another letter supported by enclosures, in response to which Dr. Grossbard prepared his second report.

Plaintiff acknowledges that she received these multiple levels of review, but complains that CIGNA failed to provide her with copies of the reports of Drs. Desch and Grossbard until after she had already completed two levels of appeals and the teleconference with the Appeal Committee had taken place. It is not clear, however, what prejudice Plaintiff's appeals suffered due to her not being provided with copies of these reports earlier in the appeals process. *See Ellis*, 126 F.3d at 238 (plaintiff not prejudiced during administrative review because "[i]t is apparent that had Ellis had the report, the data she could have submitted to MetLife would not have materially affected the Roundtable's subsequent analyses"). Aside from her decla-

ration and those of Dr. Vredenburgh, Plaintiff has submitted the same materials to the Court in support of her motion for the preliminary injunction that she submitted to CIGNA during the course of its administrative review. At the very least, it appears that CIGNA "substantively complied with the spirit and intent of full and fair review." *Id.* at 239. Therefore, Plaintiff has failed to demonstrate that there is a sufficiently substantial question concerning the merits of her ERISA claim under Count One of the complaint to justify entry of a preliminary injunction.

### 2. Plan Interpretation

Defendant admits that Ms. Smith is covered by a health and medical insurance policy provided by virtue of her employment, and is therefore a "participant" in an "employee welfare benefit plan" within the meaning of ERISA. 29 U.S.C. §§ 1002(1), 1002(7). Plaintiff, accordingly, is permitted to challenge the Plan's denial of coverage for HDCT pursuant to ERISA, which provides that a participant or beneficiary may bring a civil action "to recover benefits due him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).

▆▆▆▆ As an initial matter, the Court must address the level of deference to be accorded CIGNA's decision to deny coverage. When an employee challenges a denial of benefits to which she claims entitlement under the terms of an employee benefit plan, the Court reviews the denial of benefits under a *de novo* standard unless the benefits plan gives the administrator discretionary authority to determine eligibility for benefits or to construe the terms of the Plan. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989).

Where discretionary authority is provided, a court should review the denial under an arbitrary and capricious standard. *Id*; *Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685, 688 (7th Cir.1992). A decision is not arbitrary or capricious if it is supported by "substantial evidence," which is defined as "such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [decisionmaker and] ... requires more than a scintilla but less than a preponderance." *Zervos*, 2001 WL 253377, at * 8, *quoting Miller v. United Welfare Fund*, 72 F.3d 1066, 1072 (2d Cir.1995).

The Plan specifically designates CIGNA as having, *inter alia*, the duty to "determine the answers to all questions relating to any claimant's eligibility to receive Plan benefits." Gettas Decl., Ex. 1, § 7.03(a)(1). Further, an amendment to the Plan dated September 3, 1998 clarifies that:

> Newport News Shipbuilding ("Employer") hereby delegates to Connecticut General the authority, responsibility, and discretion to determine all questions of eligibility and status under the Plan, to interpret and construe the provisions of the Plan, as necessary, to reach factually supported conclusions, and to make a full and fair review of each claim which has been denied, pursuant to the requirements of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") ....

Gettas Decl., Ex. 3. A more specific and clear delegation of authority to interpret the terms of the Plan in order to determine questions of eligibility under the Plan is difficult to imagine.

▆▆▆▆ Thus, at trial CIGNA's interpretation of the Plan regarding Plaintiff's eligibility for benefits likely would be evaluated under an abuse of discretion standard. *Booth v. Wal–Mart Stores, Inc.*, 201

F.3d 335, 341–42 (4th Cir.2000). Accordingly, "[w]here a plan administrator has offered a reasonable interpretation of disputed provisions, [a court] may not replace it with an interpretation of [its] own." *Id.,* at 344. Nevertheless, "it is sufficient for a preliminary injunction under *Blackwelder* that the Plaintiff demonstrate that she has raised a serious question that, at trial, [CIGNA's] decision will be found arbitrary and capricious." *Wilson,* 866 F.Supp. at 908.[13] For the reasons discussed below, the Court finds that Plaintiff has established that there exists a serious question as to whether CIGNA abused its discretion in interpreting the Plan so as to deny coverage for Plaintiff's HDCT treatment. Accordingly, the requested preliminary injunctive relief is warranted.

Plaintiff's request for pre-certification of coverage was denied because CIGNA determined that (1) HDCT is not "Necessary" as that term is defined under the Plan, and (2) HDCT is "experimental/investigative" as defined under the Plan, and therefore is not a Necessary medical service. To qualify as Necessary under the Plan, HDCT must be "widely accepted professionally in the U.S. as effective, appropriate, and essential" based upon recognized standards in the field of oncology. Gettas Decl., Ex. 2, at 40. Subsumed within the definition of Necessary is the Plan's exclusion of coverage for experimental/investigative procedures.

Contrary to CIGNA's determination, the substantial evidence before the Court establishes that HDCT is a widely accepted treatment in the United States for patients with Ms. Smith's condition and is neither experimental nor investigative. "[HDCT–PSCS] has been widely available for over ten years and is an accepted treatment for metastatic breast cancer as well as many other forms of cancer." *Glauser–Nagy v. Medical Mutual of Ohio,* 987 D. Supp. 1002, 1006 (N.D.Ohio 1997). ASCO reports that more than 12,000 women with breast cancer have undergone bone marrow transplants since the mid–1980s, which implies receipt of HDCT treatment. Indeed, over ten years ago, a court in this district found that HDCT was effective, safe, and not experimental, despite the absence of results from Phase III randomized studies. *Pirozzi v. Blue Cross–Blue Shield of Virginia,* 741 F.Supp. 586, 594 (E.D.Va.1990).

It is true that preliminary results from Phase III randomized studies concerning the effectiveness of HDCT over standard and intermediate dose chemotherapy treatments have only become available in recent years. Nothing in the Plan, however, requires that a treatment be the subject of completed Phase III studies to escape the experimental/investigatory exclusion. "Many treatments become accepted without phase III studies, in part, it appears, because these studies, by their nature, are difficult to conduct." *Pirozzi,* 741 F.Supp. at 593. It would be illogical for the Court to find that HDCT, recognized since at least the early 1990s as an accepted form of treatment for breast cancer, somehow became investigative or experimental in 1999 when the results of the first Phase III studies were released.

It does not appear that HDCT yet has been proven to fulfill the high hopes doctors and the public held for the treatment

13. Plaintiff argues that even under the abuse of discretion standard, a Court can exercise heightened scrutiny where there exists a profit motivated conflict of interest in the decision maker. *See, e.g., Booth,* 201 F.3d at 343 n. 2. The Court, however, need not address this issue because it finds that Plaintiff has demonstrated the existence of a substantial issue on the merits of her claim that CIGNA's denial of coverage constituted an abuse of its discretion.

in the early 1990s. The debate in the current medical discourse concerns whether HDCT will prove to offer an advantage over SDCT. No evidence, however, has been presented to the Court which indicates that HDCT is less effective than SDCT. The terms of the Plan do not reserve coverage for only the most effective treatment available. Rather, the Plan excludes those procedures for which there does not exist "sufficient information in peer reviewed medical and scientific literature to enable [CIGNA] to make conclusions about safety and efficacy." Drs. Desch and Grossbard both acknowledge that the most current data regarding the effectiveness of HDCT demonstrate that this treatment is promising and at least as effective as SDCT. Therefore, the Court finds that there is a substantial issue as to whether the Plan's experimental/investigative exclusion, properly interpreted, would bar coverage for Plaintiff's requested HDCT treatment

With regard to another element of the term Necessary, Defendant argues that HDCT cannot be considered "essential" because it has not been shown to be more beneficial than SDCT. The Court notes that none of the reasoning underlying the denial of Plaintiff's claims or appeals was tied specifically to whether HDCT was essential in the sense that it is the most effective treatment available. Indeed, nowhere in the record does CIGNA interpret the term "essential." It is more likely, in the context of defining Necessary medical procedures, that the term "essential" is intended to exclude from coverage procedures such as elective cosmetic surgery rather than require that only the most effective treatments for a particular ailment be covered. For instance, the Plan excludes from coverage "cosmetic surgery" which is defined as "[p]lastic surgery which improves, alters or enhances appearance, except to the extent needed to

[i]mprove the function of a part of the body (other than a tooth or structure that supports the teeth) that is malformed as the result of a severe birth defect (including harelip or webbed fingers or toes) or as a direct result of a disease or surgery performed to treat disease or injury, or [r]epair an injury, which occurs while the person is covered by the Plan, while in the calendar year of the accident which causes the injury or in the next calendar year." Gettas Decl., Ex. 2, at 39. Coverage for any proposed procedure falling within the definition of cosmetic surgery likely would be deemed not essential and, accordingly, not Necessary. There can be no question that HDCT under the circumstances facing Plaintiff is not a frivolous or elective procedure, but rather one that offers Plaintiff a chance at overcoming an otherwise terminal disease.

Further, there is no substantial evidence demonstrating that HDCT, as administered at Duke, is unsafe. It is clear that HDCT is a highly toxic treatment and that overall mortality rates related to this procedure have been high in the past. Dr. Vredenburgh, however, avers, and the Defendant does not dispute, that under the HDCT regimen administered at Duke, there is only a 1–3% mortality rate, which is approximately the same rate as for standard treatments. Thus, HDCT is not only at least as effective as SDCT, it is as safe.

Finally, the Court would like to make clear that this case "is not a green light signaling a general expansion of coverage under group health policies like the Plan. Rather, this decision is narrowly, but firmly, anchored in the specific expert medical testimony presented and in the terms of and structure of" the Plan. *Pirozzi*, 741 F.Supp. at 594. Under the standards applicable to the specific facts and contract language in the record, the Court finds that Plaintiff has established a serious and

substantial issue with respect to the merits of her declaratory judgment claim, which, coupled with the likelihood that she will suffer irreparable harm should the requested relief be denied, justifies entry of a preliminary injunction requiring Defendant to certify coverage so that Plaintiff can go forward with the HDCT treatment she originally was scheduled to receive in January 2001.

## C. Public Interest

■ This is a case involving contract interpretation. As such, the public interest, which is only that the parties' agreement be enforced, is neutral with respect to the issue of whether preliminary injunctive relief is appropriate. Therefore, the Court makes no findings with regard to the public interest prong of the *Blackwelder* test.

## D. Bond

■ Rule 65(c) provides that "no ... preliminary injunction shall issue except upon the giving of a security by the applicant, *in such sum as the court deems proper*, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." Fed. R.Civ.P. 65(c) (emphasis added). Although no evidence regarding the Plaintiff's financial condition was introduced in connection with her preliminary injunction motion, it is apparent that Ms. Smith lacks the financial resources to post a bond in any meaningful amount. Obviously, if she could afford to post a bond sufficient to secure the Defendant's interests should her case ultimately fail on the merits, she would have already gone forward the HDCT treatment at her own expense. Furthermore, the Court "notes the extreme urgency with which this injunction must be issued, the dire circumstances

surrounding the Plaintiff's health, and the substantial likelihood that the Plaintiff will prevail on the merits of her claim." *Wilson*, 866 F.Supp. at 910.

During oral argument in this matter, Defendant graciously represented to the Court that, should the Court find that issuance of the requested preliminary injunctive is appropriate, it would be satisfied if Plaintiff were not required to post an injunction bond. Defendant recognizes that since Plaintiff is unable to afford independently the treatment for which she seeks insurance coverage, requiring her to post a bond would produce the harsh result that, despite receiving the preliminary injunction, she would remain unable to obtain treatment due to her inability to post the bond. *Id.* (district court exercised its discretion under Rule 65 to require no injunction bond in an HDCT case where "[i]t is apparent that to require a bond would not only defeat the Plaintiff's otherwise meritorious claim, it may also cost the Plaintiff her life"). At the time *Wilson* was decided, Judge Clarke noted that there was no Fourth Circuit case which directly addressed the discretion available to a district court with respect to setting the amount of the bond required under Rule 65(c). Judge Clarke, nevertheless, found it appropriate to set the bond in that case at zero dollars. *Wilson* was affirmed in its entirety on appeal, although the Fourth Circuit did not specifically address the bond issue. *Wilson v. CHAMPUS*, 65 F.3d 361 (4th Cir.1995). Accordingly, the Court finds that a bond of zero dollars is also appropriate under the circumstances of this case.

## III. Conclusion

For the reasons set forth above, Plaintiff's motion for a preliminary injunction hereby is **GRANTED.** In light of the irreparable injury likely to befall Plaintiff

should preliminary injunctive relief be denied and the existence of a substantial question with respect to the merits of her, claim for declaratory judgment, entry of the requested preliminary injunction effective pending trial of this matter is appropriate. Therefore, it is hereby **ORDERED** that Defendant shall provide Plaintiff with the pre-certification of coverage necessary to permit her to proceed with high-dose chemotherapy with the necessary stem cell rescue support at Duke University Medical Center pending the hearing on the merits of this case.

It is further **ORDERED** that Plaintiff shall post a bond in the sum of zero dollars.

The Clerk is **DIRECTED** to send a copy of this Order and Opinion to the counsel of record. In addition, the Court shall send a copy of this Order and Opinion to the parties via facsimile.

**IT IS SO ORDERED.**